Kate GRAY, Appellant and Appellee,

v.

G. W. GRAY, Appellee and Appellant.

No. 10325.

Court of Civil Appeals of Texas.

Austin.

Dec. 7, 1955.

Rehearing Denied Jan. 4, 1956.

Lawrence L. Bruhl, Llano; Foster, Lewis & Langley, San Antonio, for Kate Gray.

Lee & Lee, Mason; Runge, Hardeman, Smith & Foy, San Angelo, for G. W. Gray.

HUGHES, Justice.

This is a suit for divorce brought by Mrs. Kate Gray against her alleged husband, G. W. Gray. The marriage, if any, was alleged to be a common law marriage.

After a nonjury trial the court entered judgment finding that the parties were husband and wife by virtue of a valid common law marriage entered into "between November 15, 1929 and November 14, 1930, and fully consummated and publicly professed as required by law." The court further found, however, that Mrs. Gray had failed to establish by full and satisfactory evidence her right to a divorce and accordingly denied this relief, as well as all other relief sought by either party and not specifically granted.

Both parties have appealed.

We will dispose first of the appeal of G. W. Gray. He has four points which are to the effect that there is no evidence or insufficient evidence to support the finding of the trial court that the parties held each other out to the public as husband and wife, respectively, between November 15, 1929, and November 14, 1930, and that similarly that there is no evidence or insufficient evidence as to such holding out prior to the year 1941.

It is our opinion that these points should be overruled.

The parties were ceremoniously married in 1921 and divorced in 1929, Mrs. Gray not relinquishing such name. Mr. Gray was 84 years of age at the time of trial, Mrs. Gray 64.

It is undisputed that the parties lived together after the divorce apparently in much the same manner as they had lived before, Mr. Gray testifying that he was merely a boarder but Mrs. Gray testifying

that it was under an agreement that they would continue to live together as man and wife as they had previously been living. She fixed the time of this agreement as from one month to a year after the divorce.

Mr. Gray lent corroboration to this agreement by giving this testimony:

"Q. Now, Mr. Gray, through the years from 1929 up to the spring of this year, it was the usual custom for Lura and Kate and your other daughter to write to you all and call you 'folks'; isn't that right? A. I think so.

"Q. And they so addressed you when they were there in your home, did they not? A. I think they did, I don't know. I reckon they called me 'Papa' like they do today, I reckon.

"Q. Now, insofar as attending dances and things like that, you—you have attended dances with Mrs. Gray since 1929, have you not, sir? A. Yes.

"Q. And you have, on occasion, gone to funerals together? A. Yes, I think so, yes.

"Q. And that pertains to both here and in San Saba? A. Yes, I guess so, yes.

"Q. Have you attended weddings, Mr. Gray? A. I may have, but I don't remember it.

"Q. Well, there were some wedding announcements and invitations introduced here earlier. You have heard those discussed? You probably have attended some of those with Mrs. Gray through the years since 1929, have you not, sir? A. Maybe so. I think we received several invitations to things that I did not attend.

"Q. Now, Mr. Gray, also through the years since 1929, both out on the Six Mile and sometimes when you were on the Sloan, and also here at the Pat Marschall house, your friends have visited with both of you there in the house at one of those places have they not? A. Yes, sir.

"Q. And you never have, on any one of those occasions, told them that Mrs. Gray was not your wife, have you? A. I don't remember it if I did.

* * * * * *

"Q. Now, you did subsequently (after divorce) move back to Mrs. Gray's house, did you not? A. Yes, sometime. I don't know when it was. I don't know how long it was after.

"Q. Well, would you say that it was a week? A. I don't think it was that soon. You mean after the divorce.

"Q. Yes. A. I don't think so. Oh, I don't know.

"Q. It could have been in a week's time? A. No, no, no.

"Q. Well, could it have been in two weeks' time, sir? A. I don't know that, either. I don't believe that. I had several places to stay, and did stay, and right smart of little things to look after. I can't remember all that stuff.

"Q. Well, Mr. Gray, I am just trying—I'm not trying to pinpoint it down to an exact day, but I would like to get your best recollection. You have testified that you did move back there. Was it within a month after this divorce decree? A. I don't believe it was. It might have been a year or two. I don't remember how long it was. Sometime after that, I don't remember. But I know it wasn't in a day or two, or week or two, neither.

"Q. But you don't know whether it was within a month? A. I don't believe it was.

"Q. But you wouldn't state positively that it was not within a month? A. No. * * *

"Q. Well, at some point you made up your mind to move back to her house? A. I guess so.

"Q. And when that was done, had you been on friendly terms with her before that, or did you just go over to the house one day and say, 'Let's make up', or what happened? A. Damn if I recollect. I don't remember.

"Q. But you were on friendly terms with her when you moved back in? A. I reckon so, or I wouldn't have gone back. Yes.

\*　\*　\*　\*　\*　\*

"Q. \* \* \* Well, now then, Mr. Gray, I want to ask this question of you in all sincerity: Did you just consider yourself living in adultery with her? A. No, didn't do that.

"Q. Well, what did you consider the relationship to be? A. Damned if I know.

"Q. Well, let me ask you this, Mr. Gray, on the subject of what type of relationship you had with Mrs. Gray after that divorce decree and from the time you moved back into her house: You knew that she was going by the name of 'Mrs. G. W. Gray', did you not, sir? A. Yes, or, rather, I think so, yes.

"Q. And you knew that people in town called her 'Mrs. G. W. Gray'? A. I think they do yet.

"Q. Yes. And they still do? A. I think so.

"Q. You received mail at the house addressed to 'Mr. and Mrs. G. W. Gray', did you not? A. Yes.

"Q. And you received a very great many letters so addressed, did you not, sir? A. Yes, I think so, yes.

"Q. You knew then that people generally looked upon you, from that, as Mr. and Mrs. G. W. Gray, did you not? A. Well, maybe so, I don't know what them other fools thought about, and don't care.

\*　\*　\*　\*　\*　\*

"Q. So that you knew from the way people addressed you, and the way your mail came, and from the way people called her 'Mrs. G. W. Gray', that people in the community looked on you as husband and wife, did you not, sir? A. Well, I didn't know what they thought. I guess maybe they did, but I ain't sure of that, no.

"Q. Did you ever do anything to correct that idea? A. No, never did.

\*　\*　\*　\*　\*　\*

"Q. Did you get up and tell anybody that she was not your wife? A. No, don't think so.

\*　\*　\*　\*　\*　\*

"Q. Mr. Gray, I'd like to ask you this: Isn't it a fact that, all through the years, from 1919 right on down to date, that Mrs. Gray has been completely faithful to you? A. Yes.

"Q. You have never suspected her of any infidelity at all? A. No.

"Q. I understand that it is your contention here that you didn't look on her as your wife? A. No.

"Q. But isn't it a fact that she was just as faithful as a man's wife ever could be to you? A. Well, I guess so.

"Q. Well, don't you know that to be a fact? A. Yes."

There is in the record much evidence to show that Mr. and Mrs. Gray lived the life of the ordinary man and wife. They lived together, cohabited, went places together, were addressed jointly and from all public appearances were husband and wife. Mrs. Gray kept house and cooked for him, helped him in his work and nursed and cared for him in his frequent illnesses.

A. R. Weber a resident of the community for 52 years, member of the School Board for 20 years, member of the City Council for 12 years and a director of the local Chamber of Commerce and who had known the Grays for 30 years or more testified

that "everybody said they were married" and that as far as the community at large was concerned "they were considered married."

Franklin Buttery, a resident of Llano for 84 years, operator of a hardware store for over 50 years in Llano, a childhood friend and a classmate of G. W. Gray at Baylor University said that they "acted like husband and wife," that he "thought they were married," and that their general reputation in the community since 1930 was that they were husband and wife.

The Killeen Reporter in 1951 had this to say about the parties:

"We all know what fine people the Bighams are, so I would like to say a few words about the Grays, whom I met for the first time on this trip. To begin with, the family originally came from Bell County. He is a graduate of Baylor University, and I might add that, at past eighty, he has more pep and energy than I have in the fifties, working his several large ranches every day and keeping his finger on all his vast operations. Mrs. Gray, his constant companion, is one of the most charming and delightful ladies we have met in a long time. A more hospitable couple I do not recall meeting in a long career of meeting nice people. It is people like the Grays who have given to Texas its enviable reputation for sincere western hospitality."

Opposing the above evidence in confirmation of the marriage as found by the trial court is the following evidence which discounts it.

Mr. Gray flatly denied that there was any agreement to remarry. In support of his board and lodging testimony are numerous checks paid to Mrs. Gray mostly monthly and for similar amounts, one of which was marked for room and board.

The record also contains several documents or legal instruments, some by Mrs. Gray being sworn, in which the parties stated that they were single persons. Mr. Gray paid his income taxes and voted on this basis. Mrs. Gray listed her telephones "Mrs. Kate Gray" and "Kate Gray, Apt."

In addition three witnesses testified that the reputation of the parties in the community was that they were not married. One of these witnesses was Mr. Gray's banker and close friend, another a cousin of Mr. Gray's first wife and the other a person from whom Mrs. Gray had purchased land in 1930 and to whom Mrs. Gray had conveyed a house and lot in the same transaction.

■■ The essentials of a common law marriage, an agreement to live together as husband and wife, cohabitation and publicly living and holding themselves out as husband and wife within the dates found by the trial court are all present in the evidence and thus refute the points of no evidence.

We also hold that the evidence considered as a whole, is not so against the preponderance of the evidence as to be manifestly unjust.

We give little weight to the testimony of Mr. Gray that his living with his former wife was a board and room arrangement. This testimony does not have the ring of reason. It is also refuted by his own admission as to cohabitation.

The strongest evidence against the marriage is the fact that the parties executed various papers and legal instruments as single persons. This can be accounted for, partly at least, as to both parties by the fact that it is much simpler to do business as a single person than as a married person and hence was to their benefit to act as they did except as to Mr. Gray in filing income tax returns. In this regard, however, we note that Mr. Gray was extremely lax in attending to his income tax matters. As to Mrs. Gray the evidence shows that she had no college education and was not experienced in or familiar with legal documents or involved business transactions.

The most that we can say of the evidence is that it raised issues of fact which were determined by the trial court and by which

determination we feel bound. By this we do not mean to criticize the findings of the court. In fact we commend them. They tend to stabilize the continuity of a marriage originally celebrated in formal manner and which in fact has endured for more than thirty years. The episode of divorce worked no change in their manner of living and seems to have been of any great concern only to lawyers and courts.

In the appeal of Mrs. Gray from the judgment denying a divorce we have concluded that the trial court did not err. We quote her summary of the evidence to establish cruel treatment, the only alleged ground for divorce:

> "Mrs. Gray testified without contradiction that Mr. Gray had left her on many occasions without making provision for her care and maintenance; that her mother had lived in the marital home through the years, had no independent means except a small pension check and was otherwise completely dependent on the parties for her support; that he left her in the latter part of March, 1954; that he left her no money; no means of drawing checks and that she had $5.00 available to her; that his treatment of her in this regard made her nervous and almost ruined her health; that her concern over her mother and the financial situation had almost ruined her health and that she was under the care of a physician; * * *"

■ This evidence, in our opinion, merely shows abandonment short of the requisite three years under (3), Art. 4629, V.A.C.S. Nonsupport is but an incident of abandonment and standing alone is not grounds for divorce. 15A Tex.Jur. 561.

Mrs. Gray also complains that the trial court erred in not allowing her a recovery for attorney's fees. The court found that Mrs. Gray instituted this suit "without probable cause, that is, without having good grounds for divorce." This finding is in accord with the record.

■ Mrs. Gray was not entitled to recover attorney's fees as a matter of right. Edsall v. Edsall, Tex.Civ.App., Eastland, 240 S.W.2d 424; Henderson v. Henderson, Tex.Civ.App., Austin, 259 S.W.2d 780. If the trial court under the circumstances of this case was vested with a discretion to allow her attorney's fees, a matter we do not determine, then we find that no abuse of such discretion is shown. See Lewis v. Lewis, Tex.Civ.App., Fort Worth, 218 S.W.2d 220.

The judgment of the trial court is affirmed.

GRAY, J., not sitting.

## On Motion for Rehearing of Appellant Kate Gray

HUGHES, Justice.

We did not expressly dispose of Mrs. Gray's assignment that the trial court erred in adjudicating the costs against her. We fail to find error.

■ The general rule is that the successful party shall recover costs. Rule 131, Texas Rules of Civil Procedure. The burden was on Mrs. Gray in order to succeed in her suit to establish marriage as well as grounds for divorce. We do not believe that because the marriage issue developed more evidence than the divorce issue the rule as to assessment of costs should be varied.

Our opinion does not specifically adjudicate costs of appeal. This is necessary because there were two appeals but only one record.

After considering the portions of the record applicable to each appeal we assess one fourth of such costs against Mrs. Kate Gray and three fourths of such costs against G. W. Gray.

The motion for rehearing is overruled and the costs of appeal adjudicated as indicated.